UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PATRICK J. MURACA,<br>NANOMOLECULARDX, LCC<br>(a/k/a NMDX, LLC), and<br>METABORX, LLC,<br>Defendants. | Case No. 17-cv-11400 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION
<u>ORDER FREEZING ASSETS AND ORDER FOR OTHER EQUITABLE RELIEF</u>**

Plaintiff United States Securities and Exchange Commission (the "Commission" or "SEC") submits this memorandum of law, submits the declaration of Thomas Weber, and re-submits the declaration of Mark ("Albers Decl."), in support of its Motion for a Preliminary Injunction, Order Freezing Assets, and Order for Other Equitable Relief against Patrick J. Muraca ("Muraca"), NanoMolecularDX LLC ("NMDX" or "Nano"), and MetaboRX, LLC ("Metabo").

**PROCEDURAL POSTURE**

On July 31, 2017, the SEC filed a Complaint in this matter naming Patrick Muraca, NanoMolecularDX, LLC, and MetaboRX, LLC, as defendants (collectively, the "Defendants"). [Dkt. No.1]. On that same date, the Commission filed an Emergency Motion for a Temporary

Restraining Order, Order Freezing Assets, and Order for Other Equitable relief, and the Court granted such relief after a hearing at which both parties appeared either in person or telephonically. On August 14, 2017, an assented-to motion to extend the temporary restraining order was granted, and a preliminary injunction hearing was set for August 28, 2017 at 2:00 p.m..

## **INTRODUCTION**

This case involves misappropriation of investor funds by Patrick Muraca and his companies, NanoMolecularDX, LLC and MetaboRX, LLC. Muraca raised approximately $1,175,000 from at least fifteen investors for purported investment in Nano and Metabo, which he describes as pharmaceutical development startup companies. Muraca represented to investors that their funds would be used to manufacture and commercialize cancer tests, to purchase assets related to these products, and to develop clinical trials. Contrary to those specific representations, Muraca misappropriated investors' money by directing investor funds to three bank accounts – his personal bank account, the Nano business bank account and the Metabo business bank account - and then using those funds for personal expenses as well as for payments relating to friends, family and his fiancée. Muraca has, between the three accounts, collectively spent at least $400,000 of investor funds on himself or his friends and family since April 2016.

Further, Muraca has already attempted to violate the asset freeze ordered by this Court on July 31, 2017, when he prepared a series of checks for a Nano bank account payable to several current and/or former employees of the company. Without a preliminary injunction, it is likely that defendants will continue to violate the securities laws while this case is pending.

## STATEMENT OF FACTS

### I. Defendants

**Patrick Muraca**, age 48, resides in Pittsfield Massachusetts. Muraca is the President and CEO of NanoMolecularDX, LLC and MetaboRX, LLC, two purported pharmaceutical development startup companies.

**NanoMolecularDX, LLC** is a Delaware Limited Liability Company headquartered in Lee, Massachusetts. Muraca is the president and CEO of Nano, and in various communications, Muraca refers to Nano as NMDX, LLC or NMDX, INC. Muraca advertises Nano to investors as a healthcare development company focused on diagnostics (Albers Decl. Exh. #15), despite the fact that, in March of 2017, Muraca filed an application to register Nano as a foreign limited liability company whose purpose is "serving food; restaurant." Albers Decl. Exh. #12.

**MetaboRX, LLC** is a Delaware Limited Liability Company headquartered in Lee, Massachusetts. Muraca is the President and CEO of Metabo. Muraca advertises MetaboRX to investors as a "dynamic medical research company dedicated to the discovery of proprietary biomarkers and companion diagnostics for use in therapeutic applications," (Albers Decl. Exh. #10), despite the fact that in April of 2017, Muraca filed an application to register Nano as a foreign limited liability company whose purpose is "serving food; restaurant." Albers Decl. Exh. #13.

### II. The Scheme

#### A. Muraca Began His Scheme with a Lie

Muraca began his Nano scheme in the spring of 2016 with a lie. On April 12, 2016, Muraca signed an operating agreement for Nano, which gave Investor #4 a 25% ownership interest in

Nano. Albers Decl. Exh. #5. The attachment to the operating agreement stated: "[t]he initial contribution of the members of [Nano] are as follows:" and listed Muraca's contribution as "Cash: $150,000." *Id.* at p. 16. At no point did Muraca contribute $150,000 in cash to Nano. Rather, in May 2016, when a business account for Nano was opened by a purported employee of Nano, it was done with only $10. Albers Decl. ¶ 13. Further, on August 25, 2016, Muraca charged Nano $150,000 for intellectual property that he allegedly assigned to the company. Albers Decl. Exh. #6. The terms of this agreement were also not disclosed to multiple investors. Albers Decl. ¶ 26. In November 2016 Muraca made false statements to at least two other investors in an email, writing that Muraca had contributed "$250,000 to purchase valuable distressed assets." Albers Decl. Exh. #11. Muraca's bank accounts reflect no such purchase or contribution to Nano or Metabo. Albers Decl. ¶ 12.

### B. Muraca Omitted Material Facts from His Communications with Investors

At least 15 individuals have invested in Nano and Metabo from April 2016 to the present. Albers Decl. ¶ 8. Muraca sent many of these investors investment confirmations detailing the number of shares in each company they were entitled to as a result of their investment. *See, e.g.,* Albers Decl. Exh. #1. The confirmations stated, "this is to confirm your investment and ownership in [Nano or Metabo]. Any questions, please let me know. You will receive a Certificate at the close of the Seed Round." *Id.* All these confirmations were signed by Muraca as President and CEO of the respective companies. *See id.*

Muraca regularly communicated with his investors in person, on the phone, and through powerpoint presentations describing the science behind his companies. *See, e.g.,* Albers Decl. Exh. #8, Exh. #9, Exh. #10, Exh. #11, Exh. #14, Exh. #15. He also sent shareholder letters after

4

the investor had agreed to invest. These letters repeatedly represented that Nano and Metabo were on the path to commercialization. In June 2016, Muraca told investors that Metabo "is offering a $5 million in Seed round. Net offering proceeds will be used by NanoMolecularDX, primarily to finance regulatory approvals and specific quick commercialization of its diagnostic tests, a pipeline of companion and other diagnostic tests, legal and IP support and operations." Albers Decl. Exh. #8.

Muraca wrote in an October 2016 investor update to Nano investors that "the use of proceeds from this offering will be used primarily for manufacturing of pre-clinical test assays, commercialization of the tissue repository and clinical histochemistry products and for ongoing regulatory efforts to support our NanoMolecularDX development." Albers Decl. Exh. #9. As recently as July 2017, Nano issued a press release announcing the "closing of $1 million seed funding through private placement," stating that the proceeds of the seed funding "will be used to finance the commercialization of the [Nano's] diagnostic tests, the development of additional diagnostic clinical trials, and to expand operational capabilities." Albers Decl. Exh. #15. These investor updates, for all their detail about the uses to which investors' funds were being deployed, omitted the critical fact: that over a third of the investor money raised was being spent on Muraca's personal expenses, and served to lull investors into thinking that the proceeds of their investments were being used exclusively in the biopharmaceutical space.

Muraca is continuing to solicit investors (an investor deposited $80,000 into the Nano business account as recently as June 30, 2017 (Albers Decl. ¶ 8)); over one third of the investment funds raised thus far have gone to fund Muraca's personal expenditures and his fiancée's business ventures. *Id*. ¶¶ 9, 10.

### C. Muraca Directed Investors to Wire Funds to His Personal Account and Used Those Funds for Personal Expenses

As noted above, Muraca began soliciting investors for funds before he established business bank accounts for either Nano or Metabo. He directed the deposit of approximately $73,000 of investor money directly into his personal account at BB&T Bank, as follows:

- In April and May 2016, Muraca solicited approximately $17,780 from an investor for investment in Metabo. At Muraca's direction, this investor's funds were wired to Muraca's personal account. Albers Decl. ¶ 11. That investor's son wired an additional $10,000 to Muraca's personal account in April of 2016 with the description, "Re: METABOX RX INVESTMENT." *Id*.

- In May 2016, another investor wired $15,400 to Muraca's personal account. *Id*.

- In June 2016, a third investor wired $10,000 to Muraca's personal account. *Id.*

- In June 2016, a fourth investor wired $20,000 to Muraca's personal account. The wire detail referenced "NanoMolecularDX." Again Muraca sent the investor an investment contract for Nano. *Id.*

Only $1,400 of these investor funds were ultimately transferred to the Metabo business account. *Id.* ¶ 12. The remaining approximately $72,000 of investor funds were never transferred to the Nano or Metabo business accounts, which were opened in May 2016, and January 2017, respectively. Furthermore, analysis of Muraca's personal account in 2016 and 2017 reveals no obviously business-related expenses that appear to be related to the pharmaceutical development sector. *Id.* Instead, Muraca used the funds in his personal bank account for personal expenses, including, but not limited to, his mortgage, his fiancée's mortgage and his mother's mortgage, and all manner of everyday personal expenses, such as gas and

groceries.  *Id.*

### D. Muraca Used Investor Funds in the Nano and Metabo Business Accounts for Personal Expenses

As soon as investors began sending funds to the Nano bank account in July 2016, Muraca began diverting those funds for his own personal use.  He transferred substantial amounts of money to his personal bank account by writing checks to himself for "expenses."  Albers Dec. ¶ 15.  Yet, analysis of Muraca's personal account shows no apparent business expenses paid or incurred from Muraca's personal account from May 2016 through July 2017 that could justify these transfers.  Albers Decl. ¶ 12.  Muraca also used the debit cards of the business accounts to make personal expenditures with retailers. Albers Decl. ¶¶ 13, 16, 17.  In total, $161,549 of investor funds deposited in the Nano account were subsequently transferred to Muraca's personal account via checks for "expenses."  Albers Decl. Exh. #3.  In addition, $125,732 was directly debited for expenses that appear entirely personal, such as purchases at a luxury goods store, fast food establishments, a casino, grocery stores, gas, and automotive shops. Albers Decl. ¶ 10; Albers Decl. Exh. #4.

When Muraca opened the Metabo business account in January 2017, he followed the same pattern.  Over the course of three days in January, two investors wired a total of $100,000 to the Metabo business account.  Albers Decl. ¶ 19.  Over the course of the next six months, Muraca transferred or spent at least $51,224 of those funds for personal expenses ($23,523 on checks for "expenses" and $27,700 debits on personal expenses).  *Id.*; Albers Decl. Exh. #3.

Across both business accounts, expenses included charges at Walmart, the Apple Store, Big Y (a local supermarket chain), Cabelas (an outdoor hunting store), Coach (a purveyor of leather goods), Rite Aid, Sunglass Hut, Habana Premium Cigars, Home Depot, Berkshire Hill Coins and

7

Estate Jewelry, and $12,630 in ATM withdrawals. Albers Decl. ¶ 20.

As detailed in the chart below, during the following date ranges, Muraca deposited or received investor funds into the business accounts and then spent a significant portion of those funds on personal expenses, or otherwise transferred those funds to his personal account. Albers Decl. ¶¶ 17, 19. The only non-investor funds to be credited to the Nano account were a $10 deposit to open the account and under $15,000 in other deposits. Albers Decl. ¶¶ 13, 17.

| Date Range | Nano account balance at begin date | Investor Funds deposited | Checks to Muraca/ friends[1] or direct debits for personal expenses |
|---|---|---|---|
| 7/5/16 – 8/8/16 | $10 | $60,000 | $35,843 |
| 8/8/16 – 8/25/16 | $771 | $20,000 | $15,197 |
| 8/25/16 – 9/15/16 | $389 | $10,000 | $10,367 |
| 9/15/16 – 10/19/16 | $24 | $25,000 | $22,611 |
| 10/19/16 – 12/5/16 | $392[2] | $37,500 | $36,380 |
| 12/5/16 – 1/3/17 | ($264) | $50,000 | $30,242 |
| 1/3/17 – 2/17/17 | ($1,384) | $150,000 | $53,327 |
| 2/17/17 – 3/22/17 | $37,472 | $530,000 | $43,530 |
| 3/22/17 – 5/25/17 | $149,396 | $25,000 | $24,367 |
| 5/25/17 – 6/30/17 | $47,484 | $15,000 | $12,927 |
| 6/30/17 | $2,785 | $80,000 | unknown |

| Date Range | Metabo account balance at begin date | Investor Funds deposited | Checks to Muraca/ affiliates or direct debits for personal expenses |
|---|---|---|---|
| 1/25/17-6/30/17 | $10 | $100,000 | $51,224 |
| 6/30/17 | ($191) | | |

---

1 "Friends" includes amounts to or for Muraca's mother, fiancée (including to support her restaurant business), and other friends or relatives.

2 During this time period, Muraca also deposited $1,150 in cash and deposited a check for $8,500 from a consulting job he performed for an unrelated company. There was also a $1,513 credit in the account from a returned check. Thus, during this time period only $26,337 of the $37,500 Muraca spent on himself or affiliates, or on direct debits for personal expenses, was directly traceable to investor funds. Albers Decl. ¶ 17.

### E. Muraca Spent Investor Funds Supporting His Fiancée's Business Ventures

Until February 2017, Muraca's fiancée was the owner of a restaurant business located in Lee, MA (the "Lee restaurant"), which was housed at an old train station. Albers Decl. ¶ 21. Muraca spent significant amounts of investor funds for payments related to this restaurant, directly from the Nano and Metabo business accounts. Over $45,000 was paid to suppliers and to the landlord of the Lee restaurant from the Nano and Metabo accounts. *Id.*

This $45,000 included at least four separate occasions between July 2016 and January 2017, when Muraca wrote checks in the amount of $5,000 each, from the Nano account, to pay the Lee restaurant's landlord, on or around the 20th of the month. Albers Decl. ¶ 21. These checks were in the same amount and around the same date of the month that rent was paid for the Lee restaurant—for almost every other month—from Muraca's personal account. *Id.*

In addition to the amounts spent from the Nano and Metabo accounts, Muraca also spent at least another $56,335 on goods and services associated with the Lee restaurant from his personal bank account, into which $73,180 of investor funds were directly deposited. *Id.* In total, Muraca spent at least $104,239 to support the Lee restaurant. *Id.*

Muraca's use of investor funds to support his fiancée's business ventures did not stop with the closing of the Lee restaurant on or about January 29, 2017. Muraca used investor funds to pay expenses related to a second restaurant venture of his fiancée, in Lenox, MA (the "Lenox restaurant"). In January 2017, Muraca and his fiancée signed a lease agreement for a retail space at 17 Franklin Street in Lenox, MA. Albers Decl. ¶ 22. (The contract states that the property was leased by a company called "Ribosome Development Corp," but the agreement was signed by Muraca and his fiancée and states that "[t]he premises may be used and occupied for the

9

purpose of a restaurant.") The lease term was for 3 years beginning March 1, 2017, with a $15,000 security deposit and $2,000 in monthly rent. *Id*. On March 31, 2017, Muraca paid $15,000 out of the Metabo bank account to the landlord of the restaurant location in Lenox. *Id*. Muraca then wrote a check for $2,000 from the Metabo account for the April rent at the location. *Id*. As of July 30, 2016, the Lenox restaurant is still located at 17 Franklin Street in Lenox, MA. *Id*.

### F. Muraca Attempted to Violate this Court's Order of July 31, 2017

On July 31, 2017, at or around 4:45 p.m., after a notice and hearing at which Muraca's counsel appeared, the Court issued a temporary restraining order and an order freezing assets that read, in pertinent part:

> Defendants … are restrained from taking any actions to withdraw, sell, pay, transfer, dissipate, assign, pledge, alienate, encumber, dispose of, or diminish the value of in any way (including, but not limited to, making any charges on any credit card or draws on any other credit arrangement), any funds and other assets of Defendants presently held by them, for their direct or indirect benefit, under their direct or indirect control, or over which they exercise actual or apparent investment or other authority, in whatever form such assets may presently exist and wherever located.

[Dkt. No. 8, ¶ III.A].

On August 1, 2017, Muraca took actions in violation of the asset freeze by writing out checks from the Nano account to alleged employees. He also told these employees that the accounts of the business had not been frozen. At least one of these check recipients attempted to cash the check Muraca gave him, but he was told that the transaction could not be processed by the bank. *See* Declaration of Thomas Weber.

**ARGUMENT**

**I.  A PRELIMINARY INJUNCTION IS NECESSARY TO PROTECT INVESTORS AND THE PUBLIC INTEREST**

Courts shall enter a temporary restraining order or preliminary injunction in a Commission enforcement action "upon a proper showing" of federal securities law violations. *See* Section 20(b) of the Securities Act of 1933, 15 U.S.C. §77t(b); Section 21(d)(1) of the Securities Exchange Act of 1934, 15 U.S.C. §78u(d)(1).  The "proper showing" focuses on the likelihood of establishing a securities law violation and should be based on "reasonable inquiry and other credible information." *SEC v. Int'l Loan Network, Inc.,* 770 F. Supp. 678, 688 (D.D.C. 1991), *aff'd,* 968 F.2d 1304 (D.C. Cir. 1992).  The Court has broad discretion to consider evidence by affidavit rather than live testimony. *See, e.g.*, *SEC v. Frank*, 388 F.2d 486, 490 (2d Cir. 1968); *SEC v. Musella*, 578 F. Supp. 425, 427 (S.D.N.Y. 1984); *SEC v. Vesco*, 358 F. Supp. 1186, 1188 (S.D.N.Y. 1973).

In deciding whether to issue a preliminary injunction, courts in the First Circuit rely on four well-established factors: (i) the likelihood of success on the merits; (ii) the potential for irreparable harm if the injunction is denied; (iii) the balance of harm suffered by the movant if the injunction is denied weighed against that suffered by the non-movant if the injunction is granted; and (iv) the public interest. *See Charlesbank Equity Fund II v. Blinds To Go, Inc.,* 370 F.3d 151, 162 (1st Cir. 2004); *SEC v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002); *Valerio v. U.S. Bank, N.A.*, No. 10-10529, 2010 WL 2292471, at *2 (D. Mass. June 7, 2010); *R.J. Carbone Co. v. Regan,* 582 F. Supp. 2d 220, 224 (D. R.I. 2008).  Here, each of the four factors relevant to injunctive relief weighs heavily in favor of granting the requested preliminary injunction.

**A. The Commission is Likely to Prevail on the Merits of Its Claims**

> *1. The Commission Will Likely Be Able To Prove That Defendants Violated the Antifraud Provisions of the Federal Securities Laws.*

Section 10(b) of the Exchange Act and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) making an untrue statement of material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person, in connection with the purchase or sale of a security. *See* 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. To be actionable, the fraud must concern a material fact. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). Statements and omissions are material if there is a substantial likelihood that a reasonable investor would consider them important in the total mix of information available. *Id.* There also must also be a showing that the defendants acted with scienter. *Aaron v. SEC*, 446 U.S. 680, 687, n.5 (1980). Section 17(a) of the Securities Act contains similar prohibitions in the offer or sale of any security. *See* 15 U.S.C. §77q(a).[3]

Here, Muraca engaged in a scheme to misappropriate investor funds by soliciting investors with material misstatements and material omissions, selling them securities in Nano and Metabo, and using their funds for Muraca's own, unrelated purposes.

> **a. Defendants Offered and Sold Securities**

The investments the Defendants offered are investment contracts falling within the

---

[3] Section 17(a)(1) of the Securities Act requires scienter, but negligence is sufficient to establish liability under Sections 17(a)(2) and (3). *Aaron v. SEC*, 446 U.S. 680, 695-97 (1980). The distinction is unimportant here because there is ample evidence of Defendants' scienter.

definitions of securities in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. At least 15 individuals invested in Nano and Metabo between April 2016 and the present. The majority of these investors received investment confirmations detailing the number of shares in each company they were entitled to as a result of their investment. All of these confirmations were signed by Muraca as President and CEO of both Nano and Metabo.

### b. Muraca Made Materially Misleading Statements and Omissions to Investors

Muraca, and Nano and Metabo, through Muraca, made a variety of detailed communications to investors about what the investors' funds would be used for. Investors were told that the money they invested would be used for expenditures related to Nano and Metabo—which Muraca presented to those investors as pharmaceutical companies. Instead, investors' funds were diverted for Muraca's personal use, and for payments related to friends, relatives, and his fiancée. Misrepresentations concerning use of investor proceeds, including failure to disclose the diversion of investor money, are material. *See SEC v. Esposito*, No. 1:16-CV-10960-ADB, 2017 WL 1398318, at *7 (D. Mass. Apr. 14, 2017) (finding misstatements material when they suggested investor money would be used to purchase a company when, in reality, defendant intended to use money for his own purposes); *SEC v. Stinson*, No. CIV.A. 10-3130, 2011 WL 2462038, at *4 (E.D. Pa. June 20, 2011); *SEC v. U.S. Funding Corp.*, No. CIV. 02-2089(WJM), 2006 WL 995499, at *4 (D. N.J. Apr. 11, 2006); s*ee also SEC v. Prater*, 289 F. Supp. 2d 39, 52–53 (D. Conn. 2003) (reasonable investor would want accurate information about investment scheme).

### c. Misrepresentations Coincided with Offer and Sale of Securities

Defendants' fraudulent statements were made (and the scheme perpetrated) in connection with the offer, purchase, or sale of securities. Fraudulent statements or conduct are "in connection with" the offer, purchase or sale of securities as long as they "touch" upon or "coincide with" the purchase or sale of securities. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006); *SEC v. Locke Capital Mgmt., Inc.*, No. 09-100, 2010 WL 2925717, at *1-2 (D.R.I. Jul. 21, 2010). Here, Defendants' misrepresentations were in connection with the offer and sale of shares in Nano and Metabo – the securities at issue.

### d. Defendants Acted with Scienter

Scienter is a mental state embracing intent to deceive or defraud and includes recklessness. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976); *In re Cabletron Sys., Inc.,* 311 F.3d 11, 38 (1st Cir. 2002); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 252 (D. Mass. 2006). Muraca's scienter is evident from his continuous misappropriation of investor funds. He directed investors to deposit money in his personal account and diverted all but $1,400 for personal use and expenses. He used the Nano and Metabo accounts, which he controlled, as his own personal slush funds, diverting a significant share of those funds to prop up his fiancée's business ventures, as discussed above. These acts amount to a scheme to defraud investors and enrich Muraca at investors' expense. As owner of both Metabo and Nano, Muraca's scienter is imputed to the companies. *See, e.g., In re Cabletron Sys., Inc.*, 311 F.3d 11, 40 (1st Cir. 2002); *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972); *see also SEC v. Universal Express, Inc.,* 475 F. Supp. 2d 412, 424 n.4 (S.D.N.Y. 2007).

### B. A Preliminary Injunction is Necessary to Avoid Irreparable Harm to Investors

The need for a preliminary injunction is critical here. Muraca has engaged in a scheme of soliciting investors with material misrepresentations and omissions; he has dissipated the investor funds invested in Nano and Metabo over an extended period of time; and he continued to do both of these things until the Court entered the temporary restraining order on July 31, 2017.

In fact, Muraca's actions after the court order provide further evidence of the need for a preliminary injunction: On August 1, 2017, the day after the asset freeze was issued and docketed by the Court—with notice to Muraca's attorney of record—Muraca attempted to violate the asset freeze by writing out checks from the Nano account to alleged employees. He also told these employees that the accounts of the business had not been frozen. At least one of these check recipients attempted to cash the check that Muraca gave him, but he was told that the transaction could not be processed by the bank. Though Muraca was unsuccessful in his attempt to use investor funds, his actions evidence a disregard for this Court's order and for the law.

Without a preliminary injunction, Muraca is likely to continue his scheme, and to further solicit, misappropriate, and dissipate investor assets.

### C. Balance of Harms Favors Issuance of the Preliminary Injunction

The requested preliminary injunction would prevent Defendants from continuing to violate the federal securities laws. As discussed above, without this relief, Defendants will likely continue to engage in fraudulent behavior by soliciting investors to invest in Nano and Metabo based on false and misleading representations, as well as misappropriating investor assets. Given that the Commission is seeking injunctive relief to enforce laws that protect the investing

public and Defendants have no valid or justifiable claim to continue to violate those laws, the balance of the harms weighs in favor of an injunction.[4]

### D. A Preliminary Injunction is in The Public Interest

The requested preliminary injunction is also in the public interest. It will protect current investors from losing additional money that they may have invested in Defendants' scheme. It will further protect potential investors from being defrauded in connection with future securities offerings by Defendants. It will require compliance with securities laws that are designed to promote integrity in the offer, purchase and sale of securities and enable investors to make investment decisions based upon accurate and complete information.

## II. AN ORDER FREEZING ASSETS AND ENTERING OTHER EQUITABLE RELIEF IS NECESSARY AND APPROPRIATE.

Each of the proposed components of the proposed preliminary injunction falls within the broad equity powers afforded to courts under Sections 22(a) of the Securities Act and Section 27 of the Exchange Act. *See, e.g., Thibeault*, 2015 U.S. Dist. LEXIS at *12–*18 (granting SEC's requests for, among other things, an asset freeze, accounting, expedited discovery, and order enjoining destruction of documents).

---

[4] The Commission has been notified that there are potentially valuable assets in the custody or control of the defendants that are in danger of deterioration if they are not properly stored at specific temperatures (such as tissue samples). As defendants have not complied with the Court's accounting requirement, and have not submitted a list of these (or any other) assets to the Commission, the Commission has been unable to evaluate this claim, nor does the Commission know the nature, number, location(s), or value of these assets. To the extent that these assets could provide value to harmed investors, the Commission has an interest in ensuring their preservation. The Commission has repeatedly requested information from the defendants regarding the alleged perishable assets and has requested a proposal for their preservation, including a proposal regarding what funds could or should be unfrozen to pay for the preservation thereof.

### A. An Asset Freeze is Necessary

A court may order an asset freeze to effectuate the purposes of the federal securities laws and to ensure that wrongdoers do not profit from their unlawful conduct. *SEC v. Manor Nursing*, 458 F.2d 1082, 1103 (2d Cir. 1972); *SEC v. Drexel Burnham Lambert, Inc.*, 837 F. Supp. 587, 613 (S.D.N.Y. 1993). Such relief is important because, if Defendants are able to dissipate or conceal their assets during the litigation, a final judgment ordering disgorgement or civil monetary penalties may be rendered meaningless. *See Fife*, 311 F.3d at 8 (affirming asset freeze order when defendants misappropriated investors' funds and repeatedly lied to investors), *cert. denied*, 538 U.S. 1031 (2003); *see also SEC v. Lauer*, 52 F.3d 667, 699 (7th Cir. 1995) (affirming preliminary injunction "designed to freeze the defendants' assets with a view to eventual disbursement to the ultimate victim of the fraud"). Courts in the First Circuit apply the same four-part test when deciding whether to enter an asset freeze that they consider when deciding to enter preliminary injunctive relief. *See Charlesbank Equity*, 370 F.3d at 161. Irreparable harm may be shown "where there is a strong indication that the defendant may dissipate or conceal assets." *Micro Signal Research Inc. v. Otus*, 417 F.3d 28, 31 (1st Cir. 2005).

Here, an asset freeze is necessary as part of a preliminary injunction order to prevent Muraca from dissipating or concealing any remaining investor funds and to ensure that the Defendants' assets are available to satisfy an eventual judgment for disgorgement and/or a penalty.

### B. An Accounting, Expedited Discovery, and an Order Barring Defendants From Soliciting Additional Investments is Necessary

To assess the scope of a fraud and trace a defendant's receipt of investor funds, courts often order defendants in a Commission enforcement action to provide an immediate accounting

of all money or property obtained as a result of the fraudulent activity, as well as their current assets or other resources.  *See, e.g.*, *Manor Nursing*, 458 F.2d at 1105; *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997); *SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992).  As the court stated in *SEC v. Lybrand*, an accounting is "appropriate to determine: (1) the amount of profits reaped from the allegedly illegal sales; (2) the present location of such proceeds; and (3) these defendants' ability to repay." 2000 WL 913894, at *12 (S.D.N.Y. July 6, 2000).

Here, an accounting is needed to determine the exact amount of investor assets obtained by Defendants and the disposition of those assets in order to attempt to make investors whole. Expedited discovery and an order prohibiting destruction or alteration of documents are also appropriate given the urgency of the matter, and to expedite the identification and preservation of any remaining investor funds.  Additionally, an order barring alteration or destruction of documents is appropriate to preserve the status quo. Lastly, an order barring defendants from soliciting additional investments is necessary to ensure that Muraca does not create additional victims while this case is pending, as the evidence indicated that he will continue to solicit investors unless he is restrained from doing so.

## **CONCLUSION**

For the foregoing reasons, the Commission requests this Court issue a preliminary

injunction, order freezing assets and order for other equitable relief in the form submitted.

                                                Respectfully submitted,

                                                SECURITIES AND EXCHANGE COMMISSION

                                                By its attorneys,
                                                /s/ Rebecca Israel
                                                Rebecca Israel
                                                Martin F. Healey (BBO #227550)
                                                33 Arch Street, 23rd Floor
                                                Boston, Massachusetts  02110
                                                Telephone:  (617) 573-4582
                                                Facsimile:   (617) 573-4590
                                                E-mail:  israelr@sec.gov

Dated: August 24, 2017

## CERTIFICATE OF SERVICE

      I hereby certify that on August 24, 2017, a true copy of the above document was served by the Electronic Filing System upon:

**Anthony P. Doyle**
Barry & Doyle
8 Rank Row
Pittsfield, MA 01201
413-499-1701
Fax: 413-448-6223
Email: anthony.doyle@apdoylelaw.com

                                            /s/ Rebecca Israel
                                            Rebecca Israel