**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                                    )
SECURITIES AND EXCHANGE                             )
COMMISSION,                                         )
                                                    )
            Plaintiff,                              )
                                                    )        Civil Action No.
      v.                                            )        17-cv-11400
                                                    )
PATRICK J. MURACA;                                  )
NANOMOLECULARDX, LLC                                )
(a/k/a NMDX, LLC); and                              )
METABORX, LLC,                                      )
                                                    )
            Defendants.                             )
_____ )


**MEMORANDUM AND ORDER**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

        This is a civil enforcement action brought by the Securities and Exchange Commission

against Patrick Muraca and two companies that he founded, NanoMolecularDX, LLC and

MetaboRX, LLC.  Essentially, the SEC alleges that Muraca raised investor funds and then

diverted a substantial portion for his personal use.  The complaint alleges that defendants

violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), § 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 340.10b-5.

        The SEC and NanoMolecularDX, LLC have filed cross-motions for summary judgment.

For the following reasons, the motion of the SEC will be granted and the motion of

NanoMolecularDX, LLC will be denied.

# I. Background

## A. Factual Background

Patrick Muraca served as President and Chief Executive Officer of NanoMolecularDX, LLC ("NMDX") and MetaboRX, LLC ("Metabo"). Both companies are Delaware limited liability companies headquartered in Lee, Massachusetts. (Pl. SOF ¶ 2-3)

The business of NMDX was to develop technology for detecting and monitoring biomarkers in oncology and endocrinology. (*Id.* ¶ 5). NMDX's website stated that it focused on developing *in vitro* diagnostic and research-use-only diagnostic assays and kits. (*Id.*).

The business of Metabo was to develop "novel therapies for cancer and metabolic disease." (*Id.* ¶ 6). Metabo's website stated that it was building therapies to "attack[] . . . fatty acid synthase (FAS)," "a well-tested, proven metabolic enzyme" "that regulates the production of fatty acids in our body." (*Id.*).

### 1. Muraca's Communications to Investors

In April 2016, Muraca began soliciting investors for the companies. (*Id.* ¶ 4). On September 6, 2016, he e-mailed investors a solicitation letter that stated the following:

> The proceeds from this Seed offering will be used primarily for (i) Development and manufacturing of FAS and HER-2 for the commercialization of Manual kits, (ii) commencing the FDA review for the Nano based Product, and (iii) supporting ongoing regulatory and operation efforts necessary for commercialization. The completion of this Seed financial is critical for our pre-commercialization efforts.

(*Id.* ¶ 7). He e-mailed investors another solicitation letter on October 21, 2016, stating that "the use of proceeds from this offering will be used primarily for Manufacturing of pre-clinical test assays, commercialization of the Tissue repository and clinical histochemistry products and for ongoing regulatory efforts to support our NanoMolecularDX development." (*Id.* ¶ 8). On November 3, 2016, he e-mailed investors another solicitation letter stating that additional

investments "will allow the company to move the development of the Nuvera assets on the [Nano] platform forward and will help to find a new initiative at the Center for Nanoscale Science and Engineering (CNSE) for the development of this asset . . . ." (*Id.* ¶ 9).

On March 16, 2017, Muraca e-mailed investors a "financing update" providing as follows:

> The Company seeks strategic financing up to a maximum of $1,000,000 USD in aggregate. The purpose of this strategic financing is:
>
> 1. Acquire assets of Nuclea Biotech through court-ordered bankruptcy liquidation. The purchase price for these assets is $300,000, plus associated fees. Estimated total cost is $350,000.
>
> 2. Assess, analyze and monetize the aforementioned assets. Estimated cost is $350,000.
>
> 3. Fund ongoing corporate operations, bridging the revenue gap created by the billing cycle inherent in the current service contract with [a large laboratory]. Estimated cost is $250,000.

(*Id.* ¶ 10).

### 2.  Muraca's Misappropriation of Investor Funds

Between April 29, 2016, and June 30, 2017, fifteen individuals invested $1,175,680 in NMDX and Metabo. (*Id.* ¶ 11; Albers Dec., ¶ 9).[1] The investments were made either by wire or by check. (Albers Dec., ¶ 9). Of that amount, $73,180 was deposited directly into Muraca's

---

[1] In support of that fact, the SEC cites to ¶ 12 of its statement of undisputed facts, which itself cites to the declaration of Mark Albers, a forensic accountant in the SEC's Boston office. (Docket No. 1-2). NMDX "objects to the Albers declaration as improper hearsay and violative of Fed. R. Evid. 1001." (Docket No. 97-1). NMDX's objections are without merit. First, an affidavit or declaration may be used to support a motion for summary judgment if it complies with the requirements of Fed. R. Civ. P. 56(c)(4), which is that it (1) is based on personal knowledge, (2) sets out admissible facts, and (3) is made by a competent declarant. NMDX offers no indication as to what particular statements in the declaration constitute hearsay. And Albers clearly states that his declaration is "based upon [his] personal knowledge, information and belief, except where indicated." Second, Fed. R. Evid. 1001 simply sets forth a set of definitions, and thus it is unclear as to how NMDX believes the rule has been violated by the declaration.

personal bank account; $1,002,500 was deposited into NMDX's business bank account; and $100,000 was deposited into Metabo's business bank account. (*Id.*, ¶¶ 11, 17, 19).

Muraca diverted at least $411,684 of the investors' funds for his personal use. In addition to the $73,180 that he received directly into his personal account, he transferred $161,549 into his personal account by checks from the NMDX account and $23,523 by checks from the Metabo account. (*Id.*, ¶ 10). Muraca also directly spent $125,732 from the NMDX account and $27,700 from the Metabo account on personal expenses.

### 3. Muraca's Criminal Case

On December 4, 2017, Muraca was indicted in the United States District Court for the Southern District of New York. (Huntington Dec., ¶ 2, Ex. 1). On June 20, 2018, the government filed a superseding indictment asserting one count of wire fraud and one count of making a false statement to the FBI. (*Id.*, ¶ 3, Ex. 2). The wire-fraud count alleged as follows:

> From at least in or about 2016, up to and including in or about July 2017 . . . PATRICK MURACA . . . willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MURACA defrauded investors in two companies he founded and controlled . . . by soliciting investments purportedly to expand the companies' businesses, and then misappropriating the invested funds for his personal use, and in connection therewith and in furtherance thereof, MURACA transmitted and caused to be transmitted interstate e-mails and wire transfers of funds.

(*Id.*, ¶ 3, Ex. 2).

On August 8, 2018, Muraca was convicted on both counts. (*Id.*, ¶ 4; Ex. 3). He was sentenced to 27 months in prison, followed by a supervised release term of three years and restitution in the amount of $132,780. (*Id.*, ¶5; Exs. 1, 4). It also appears that an order of

forfeiture and money judgment was issued in the amount of $1,165,280.  (*Id.*, ¶ 5; Ex. 4).

## B.  Procedural History

The SEC filed this action on July 31, 2017.  On March 15, 2018, the United States filed a motion to intervene and to stay discovery pending completion of the criminal case.

The Court granted the motion to intervene and to stay on April 27, 2018.  On March 15, 2019, the Court issued an order lifting the stay.

The SEC has moved for summary judgment.  NMDX has opposed the SEC's motion and cross-moved for summary judgment.[2]

## II.  Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant,

---

[2] Neither Muraca nor Metabo has filed an opposition to the SEC's motion for summary judgment.  "When a non-moving party fails to file a timely opposition to an adversary's motion for summary judgment, the court may consider the summary judgment motion unopposed, and take as uncontested all evidence presented with that motion."  *Perez-Cordero v. Wal-Mart Puerto Rico*, 440 F.3d 531, 533-34 (1st Cir. 2006).  "However, even where a motion for summary judgment is unopposed, a district [court] is still bound to review the case on the merits based on the uncontroverted facts before [it]."  *Cordi-Allen v. Halloran*, 470 F.3d 25, 28 (1st Cir. 2006).

drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.

2009). When "a properly supported motion for summary judgment is made, the adverse party

must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotations omitted). The non-moving party may

not simply "rest upon mere allegation or denials of his pleading," but instead must "present

affirmative evidence." *Id.* at 256–57.

## III.    Analysis

### A.    The Motion of the SEC

The complaint alleges that Muraca, NMDX, and Metabo violated (1) § 17(a) of the

Securities Act of 1933, 15 U.S.C. § 77q(a), and (2) § 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 340.10b-5. The SEC seeks summary

judgment as to both claims.

"To have violated Section 10(b) and Rule 10b-5, [a person] must have: (1) made a

material misrepresentation or a material omission as to which he had a duty to speak, or used a

fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."

*S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (internal citation omitted).

A representation "is material if there is a substantial likelihood that a reasonable investor would

consider it important in deciding whether or not to invest his money in a particular security."

*S.E.C. v. Fife*, 311 F.3d 1, 9 (1st Cir. 2002) (citing *Basic v. Levinson*, 485 U.S. 224, 231-232

(1988)).

"Essentially the same elements are required under Section 17(a)(1)-(3) in connection with

the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an

injunction under subsections (a)(2) or (a)(3)." *Monarch*, 192 F.3d at 308.

The SEC contends that Muraca violated both sections 17(a) and 10(b) (and Rule 10b-5) by telling investors that he would be using all of their funds to develop the business of the companies, when in reality he planned to take some of that money for his own personal use. Its motion for summary judgment essentially contends that issue preclusion should apply to Muraca, based on his criminal conviction for wire fraud, and that because his "misconduct and scienter may be imputed to [NMDX] and Metabo," the companies must also be deemed to have committed the same violations.

### 1. **Issue Preclusion**

Issue preclusion, also known as collateral estoppel, "bars parties from re-litigating issues of either fact or law that were adjudicated in an earlier proceeding." *Robb Evans & Associates, LLC v. United States*, 850 F.3d 24, 31 (1st Cir. 2017). "[T]here are four prerequisites to the application of [issue preclusion]. The party seeking preclusion must show that '(1) both proceedings involve[] the same issue of law or fact, (2) the parties actually litigated that issue [in the prior proceeding], (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits.'" *Id.* at 32 (quoting *Global NAPs, Inc. v. Verizon New Eng. Inc.*, 603 F.3d 71, 95 (1st Cir. 2010)).

"It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding." *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951) (citing *United States v. Greater N.Y. Live Poultry Chamber of Commerce*, 53 F.2d 518 (S.D.N.Y. 1931)). Here, Muraca's wire-fraud conviction required the jury to find all of the elements that are necessary to support civil liability under § 17(a), § 10(b) and Rule 10b-5: that he made a material misrepresentation, with scienter, in connection with the purchase or sale of securities. Indeed, the jury in Muraca's criminal case necessarily concluded

that he acted "willfully and knowingly" and "intending . . . to defraud."  (Huntington Dec., ¶ 3, Ex. 2) (quoting indictment listing charges against Muraca).

It is true that this is a civil case, and therefore does not involve precisely the same legal issues as the criminal case.  Nonetheless, courts have long held that a defendant's criminal conviction for wire fraud can establish that he also violated § 17(a), § 10(b), and Rule 10b-5, even though "the statutory violations differ."  *See S.E.C. v. Dimensional Entertainment Corp*., 493 F. Supp. 1270, 1277 (S.D.N.Y. 1980).  Indeed, the factual allegations underlying Muraca's criminal conviction are nearly identical to those underlying the civil allegations.  It is thus immaterial that his criminal conviction was for wire fraud and the civil allegations are for securities fraud.

Accordingly, based on principles of issue preclusion, Muraca is liable for having violated § 17(a), § 10(b), and Rule 10b-5.  Summary judgment will therefore be granted to the SEC as to the claims against Muraca.

## 2.    <u>Imputing Muraca's Misconduct to the Companies</u>

The SEC next contends that Muraca's misconduct should be imputed to NMDX and Metabo.

A corporation or other entity "may be held liable co-extensively with the officer or employee actually responsible for the fraudulent conduct engaged in while in the course of the employment and while transacting corporate business."  *American Gen. Ins. Co. v. Equitable Gen. Corp.*, 493 F. Supp. 721, 747 (E.D.Va. 1980) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 154 (1972)).

Here, Muraca was the founder, President, and CEO of NMDX and Metabo.  He undoubtedly qualified as an "officer" and "employee" of the two LLCs. And his fraudulent

conduct—that is, his making of misrepresentations to investors—was performed as part of his efforts to raise more than $1 million for NMDX and more than $100,000 for Metabo.  A CEO's efforts to raise investment funds for his company plainly constitute actions performed in the course of his employment with the company, and while transacting corporate business.  *See Baena v. KPMG LLP*, 453 F.3d 1, 7 (1st Cir. 2006) (holding that a CEO's "approval and oversight" of "fraudulent financial statements" qualifies as work performed on the company's behalf and is "typically enough to attribute [his] actions to the company itself").

NMDX offers essentially three arguments as to why Muraca's conduct should not be imputed to it.

First, it contends that the SEC has admitted that Muraca was "not acting 'within the scope of his employment at NMDX' or 'on behalf of NMDX' when 'he used funds invested in NMDX for his personal benefit.'"  (Opp. at 6).[3]  That admission, however, does not resolve the issue. Whether Muraca's conduct should be imputed to NMDX turns not on whether he was acting on its behalf when he *used* the funds invested in the company for his personal benefit; rather, the question is whether Muraca was acting on the company's behalf (or within the scope of his employment) when he *raised* the funds—that is, when he made the material misrepresentations to investors.  *See Baena*, 453 F.3d at 7 (finding that committing fraud to "facilitate stock sales or acquisitions" is well-within an officer's duty and a company's interests).  And there is no dispute that the claims at issue here involve fraudulent statements made by Muraca to investors as part of a sale of securities.

---

[3] In response to a request for admissions propounded by NMDX, the SEC admitted that "Muraca was not acting within the scope of his employment with NMDX when he used funds invested in NMDX for his personal benefit," and that "Muraca was not acting on behalf of NMDX when he used funds invested in NMDX for his personal benefit."  (Hagan Dec., Ex. A).

Second, NMDX contends that an SEC accountant, Mark Albers, acknowledged at his deposition that a substantial portion of the funds so raised were used for legitimate purposes. At his deposition, Albers stated that according to his review of the records, Muraca used approximately $332,681 of the $1,002,500 that had been deposited into NMDX's account on personal, "nonbusiness" expenses. (Albers Dep. at 66). Albers stated that he had "categorized" the remaining $669,819 as having been used on NMDX's business expenses. (*Id.*). NMDX contends that this "shows that NMDX conducts its business in a manner consistent with investors' expectations—showing no misrepresentation outside of Muraca's misuse of funds." (Opp. at 6). But the fact that Muraca used some of the money for legitimate purposes does not answer the question whether NMDX can be held responsible for the diversion of the rest. To repeat, the claims at issue here involve misrepresentations made to investors; Muraca may have misused only *some* of the funds, but *all* of the money was raised by means of misrepresentations.

Third, NMDX contends that Muraca's fraud was adverse to NMDX and that imputation of his conduct should thus be barred by the "adverse interest exception." That exception applies "where [an officer's] wrongdoing is done primarily for personal benefit of the officer and is 'adverse' to the interest of the company." *Baena*, 453 F.3d at 7.[4] Normally, the exception applies where the employee does something entirely adverse to the company—for example, when an employee "use[s] the company car in a bank robbery." *Id.*

The exception does not, however, "preclude 'wrongdoing' of [] officers from being

---

[4] In *Baena*, a company's upper management, including the CEO, had approved and overseen a series of fraudulent financial statements put together by the company's accountant. That fraud, which allowed the company to overstate earnings and facilitate stock sales and acquisitions, was ultimately "not in the long-term interest of the company." *Baena*, 453 F.3d at 7. However, because the fraud "profit[ted] the company in the first instance," the adverse interest exception did not apply, "and the company [was] still civilly . . . liable" based on the actions of its management. *Id.*

imputed to the company." *Id.* Allowing the rule to have that effect would "wipe out corporate liability on many fronts." *Id.* And that is true even when an officer's wrongdoing benefits himself in addition to the company—that fact "alone does not make [the officer's] interests adverse" to the company's. *Id.* at 7-8.

The adverse interest exception does not apply here. Of course, Muraca's fraud was not in the company's interest. He stole money from the company as part of the fraud, and thus damaged its finances and reputation (and indeed threatened its very survival). However, because his fraud certainly "profited the company in the first instance"—causing it to obtain more than $1 million in investor funds—NMDX may be held liable for his actions.

In summary, (1) issue preclusion requires finding that Muraca violated the securities laws, and (2) Muraca's liability can be imputed to NMDX. The same analysis applies to the claims against Metabo. Accordingly, summary judgment will be granted to the SEC.

**B.      The Cross-Motions of NMDX**

NMDX has also cross-moved for summary judgment, essentially raising two separate arguments.

First, NMDX contends that because the SEC has no evidence that anyone other than Muraca engaged in fraudulent conduct or acted with scienter, and because his actions cannot be imputed to NMDX, NMDX cannot be found to have committed securities fraud. For the reasons set forth above, those contentions are incorrect and will be rejected.

Second, NMDX contends that the SEC should be judicially estopped from arguing that Muraca's criminal conviction should result in a finding of liability against the company. In substance, it argues that because the prosecutors at Muraca's criminal trial portrayed it as a victim—by stating that the company was performing "real work," had "real assets," and that its

work "suffered" as a result of Muraca's conduct—the SEC should be "judicially estopped from arguing the opposite now."  (Def. Mem. in Supp. at 9).

Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227, n.8 (2000) (citing *Rissetto v. Plumbers Steamfitters Local 343*, 94 F.3d 597, 605 (9th Cir. 1996).  In other words, judicial estoppel "may apply to bar a litigant from engaging in intentional self-contradiction . . . as a means of obtaining unfair advantage." *Desjardins v. Van Buren Community Hosp.*, 37 F.3d 21, 23 (1st Cir. 1994) (internal quotation omitted).  "Judicial estoppel should be employed when a litigant is playing fast and loose with the courts, and when intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice." *Patriot Cinemas, Inc. v. General Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987) (internal quotations omitted).

As NMDX itself acknowledges, however, "the government in all its guises cannot inevitably be viewed as a single party."  *United States v. Ledee*, 772 F.3d 21, 30 (1st Cir. 2014). In particular, courts have made clear that the United States Attorney (the party responsible for prosecuting Muraca) and the SEC (the party bringing the current action against Muraca and NMDX) "are not the same party."  *United States v. Hickey*, 367 F.3d 888, 893 (9th Cir. 2004). When the SEC brings an action "pursuant to the Securities Act of 1933 and the Securities Exchange Act of 1934," as here, it does "not act[] as 'the federal sovereign vindicating the criminal law of the United States.'"  *Hickey*, 367 F.3d at 893 (quoting *United States v. Heffner*, 85 F.3d 435, 439 (9th Cir. 1996).  As a general matter, "courts have recognized in the preclusion context the folly of treating the government as a single entity in which representation by one government agent is necessarily representation for all segments of the government."  *Ledee*, 772

F.3d at 30; *see also United States v. Alky Enters., Inc.*, 969 F.2d 1309, 1314-15 (1st Cir. 1992)

(holding that the Interstate Commerce Commission should be considered distinct from the

Attorney General of the United States).

NMDX acknowledges that courts often treat government agencies as separate parties, but

contends that the Court should not do so here because (1) "the SEC seeks to use the prior

conviction offensively, effectively attempting to silence NMDX" and (2) because "the DOJ and

the SEC have acted in concert in this litigation, staying the claims here so that the criminal trial

could proceed." (Def. Mem. in Supp. at 12). Neither contention warrants the application of

judicial estoppel here.

To begin, NMDX was unquestionably a victim of Muraca's misconduct, even if it is

responsible for that misconduct as a matter of law. Broadly speaking, there are at least two sets

of victims here: the investors (who invested in the companies based on false representations)

and the companies (from whom Muraca stole funds). It is therefore not inconsistent for the

United States Attorney to argue that NMDX is a victim and for the SEC to argue that the

investors are victims. Both propositions are true, and do not contradict one another.

Furthermore, the fact that the government is using Muraca's prior conviction offensively

is entirely unremarkable. The government routinely uses a defendant's prior conviction to

subsequently establish civil liability based on principles of issue preclusion. *See, e.g., Local 167

of Int'l Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America v. United

States*, 291 U.S. 293, 298-299 (1934). There is nothing about this case to warrant a departure

from those basic principles.

Likewise, the claim that DOJ and the SEC have "acted in concert in this litigation" is

unremarkable and, indeed, overstated. DOJ's involvement in this civil proceeding was limited to

a motion to intervene and to stay discovery in order to avoid any effect on its ongoing criminal case. Other than staying discovery in this case, NMDX is unable to point to any actions the DOJ took in this case, or even any actions the SEC took in Muraca's criminal case, much less establish any impropriety.

In any event, judicial estoppel serves to prevent the same party from taking contrary positions. The SEC and DOJ are not the same party, and their positions are not contrary. *See Hickey*, 367 F.3d at 893. And NMDX has provided nothing to suggest that either the DOJ or the SEC has "play[ed] fast and loose with the courts" or engaged in "intentional self-contradiction . . . as a means of obtaining unfair advantage." *See Patriots Cinemas*, 834 F.2d at 212. Accordingly, the SEC is not judicially estopped from asserting its claims. NMDX's motion for summary judgment will therefore be denied.

## C.    Remedies

The SEC seeks three separate remedies in its motion for summary judgment: (1) a permanent injunction; (2) disgorgement, plus prejudgment interest; and (3) a civil penalty.

### 1.    Permanent Injunction

First, the SEC seeks to have the Court enter a permanent injunction against all three defendants pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(1) of the Securities Exchange Act, 15 U.S.C. § 78u(d)(2). Both statutes permit the issuing of injunctions to prevent ongoing or future violations.

The First Circuit "has upheld issuance of injunctions [under § 78] in cases where future violations were likely." *S.E.C. v. Sargent*, 329 F.3d 34, 39 (1st Cir. 2003). To assess the likelihood of future violations, "[c]ourts consider, among other things, the nature of the violation, including its egregiousness and its isolated or repeated nature, as well as whether the defendants

will, owing to their occupation, be in a position to violate again." *Id.*

Here, Muraca is sufficiently likely to commit future violations to warrant an injunction under the statutes. Although it is true that Muraca is currently imprisoned, and thus not immediately in a position to commit securities violations, the nature of his fraudulent scheme— in particular, the fact that the scheme involved multiple misrepresentations over a prolonged period of time—warrants an injunction against him individually.

The SEC, however, has not proposed what the terms of any injunction should be. Without any guidance from the government, the Court will simply enter an injunction tracking the relevant statutory language.

As to the companies, however, the issue is entirely unclear. The SEC's statement of undisputed facts, although sufficient to warrant summary judgment on the question of liability, provides next to nothing as to facts concerning the companies' current state of affairs, including the likelihood of a recurring violation. The Court cannot go outside the record, or speculate as to the existence of facts not in the record. Accordingly, the Court will not grant summary judgment as to the SEC's request for an injunction against NMDX and Metabo.

## 2. <u>Disgorgement and Prejudgment Interest</u>

The SEC also seeks an order requiring Muraca to pay disgorgement in the amount of $411,684 and prejudgment interest on the disgorgement in the amount of $31,442. It also contends that NMDX and Metabo should be held jointly and severally liable for those amounts.

A court that has found federal securities law violations "has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits." *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). "The primary purpose of disgorgement as a remedy for violation of the securities laws is to deprive violators of

their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *Id.*

A district court has "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *Id.* at 1474-75. "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation." *Id.* at 1475, quoting *S.E.C. v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995).

There is no doubt that Muraca misappropriated at least $411,684 for his personal use. The entirety of that amount qualifies as "ill-gotten gains," and he will be ordered to pay disgorgement in that amount.

Whether the companies should be ordered jointly and severally liable for those amounts is a different question. Courts have held companies and their officers jointly and severally liable for disgorgement when the violations committed by the company and the officer are "closely intertwined." *S.E.C. v. Esposito*, WL 2012688 at *9 (D. Mass. Apr. 30, 2018); *see also S.E.C. v. Locke Capital Management, Inc.*, 794 F. Supp. 2d 355, 369-70 (D.R.I. 2011) (holding company and its sole owner and CEO "jointly and severally liable . . . for disgorgement" because their violations were "so closely intertwined.").

NMDX contends that it should not be held jointly and severally liable for disgorgement because "[a]s part of a corporate restructuring of NMDX, the equity holders had the opportunity to continue as investors or have their equity repurchased at the original price, and all but two decided to retain their equity and are still equity holders in NMDX." Accordingly, NMDX contends, "[t]hese equity holders have already absorbed the original loss incurred by [] Muraca's acts and should not be forced to absorb a second, equal or greater loss through disgorgement, penalties, and interest."

The general thrust of NMDX's argument is correct, at least on the present record. Again,

"disgorgement as a remedy . . . is to deprive violators of their ill-gotten gains." *First Jersey Securities*, 101 F.3d at 1474. Muraca obtained $1.175 million from investors through false representations.[5] Even assuming that entire amount represents the "ill-gotten gains," it is unclear what disgorgement from NMDX would achieve. Each investor has been given the opportunity to have his or her investments returned in full (which two of them have elected to do) or returned by the company (which, effectively, is a reinvestment of the original amount). Disgorgement would therefore neither benefit investors nor the company, and would require the payment of funds that the investors (the victims) would prefer to keep invested. Disgorgement would thus, as a practical matter, serve only as an additional penalty. Accordingly, the Court sees no reason, as an equitable matter, or otherwise, to hold either NMDX or Metabo jointly and severally liable for the disgorgement obligation of Muraca.

The SEC also seeks an order requiring defendants to pay $31,442 in prejudgment interest on the disgorgement amount of $411,684.

"An award of pre-judgment interest in a case involving violations of the federal securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness." *S.E.C. v. Tome*, 638 F. Supp. 638 (S.D.N.Y. 1986). Although the First Circuit has stated that it has "found no case holding that an award of disgorgement must always be accompanied by an award of prejudgment interest," it has recognized that "many courts that order disgorgement routinely also order payment of prejudgment interest." *Sargent*, 329 F.3d at 41, n.1 (internal quotations omitted). Prejudgment interest rates are commonly calculated using the rate applied by the Internal Revenue Service to calculate underpayment

---

[5] The SEC seeks disgorgement of only $411,684, the amount that Muraca misappropriated for his personal use.

penalties.  *S.E.C. v. Spencer Pharmaceutical Inc.*, 2015 WL 5749436 at *7 (D. Mass. 2015)

(citing I.R.C. § 6621(a)(2); *SEC v. Druffner*, 517 F. Supp. 2d 502, 512 (D. Mass. 2007).

"[A]n assessment of prejudgment interest, like the disgorgement remedy, is intended to

deprive wrongdoers of profits they illegally obtained by violating the securities laws."  *Id.* at 40

(internal quotations omitted).  If a court does not order prejudgment interest, a defendant who

has violated securities law receives an "interest-free loan" on the profits he has made through his

fraud.  *Id.* at 41.

Accordingly, Muraca will be ordered to pay disgorgement in the amount of $411,684,

plus prejudgment interest in the amount of $31,442.  NMDX and Metabo will not be held jointly

and severally liable for the disgorgement or the prejudgment interest.

### 3. Civil Penalty

Finally, the SEC contends that the Court should impose a civil penalty against defendants

pursuant to Section 20(d)(2) of the Securities Act, 15 U.S.C. § 77t(d)(2), and Section 21(d)(3) of

the Exchange Act, 15 U.S.C. § 78u(d)(3).  "Those statutes authorize the Court to determine the

amount of the penalty 'in light of the facts and circumstances."  *Esposito*, 260 F. Supp. 3d 79, 92

(D. Mass. 2017) (quoting 15 U.S.C. §§ 78u(d)(3)(B)(i), 77t(d)(2)(A)).  "Both statutes provide

three tiers of penalties, the amount increasing with the severity of the violation.  The "Tier I

penalties are generally applicable . . . Tier II penalties require 'fraud, deceit, manipulation, or a

deliberate or reckless disregard of a regulatory requirement,' . . . and Tier III penalties require the

Tier II elements plus 'substantial losses or . . . significant risk of substantial losses to other

persons."  *Id.* (internal quotations omitted).

"Civil penalties are intended to punish the individual wrongdoer and to deter him and

others from future securities violations."  *S.E.C. v. Monterosso,* 756 F.3d 1326, 1338 (11th Cir.

2014). "In determining the appropriate fine, courts have considered factors including the egregiousness of the violation, the defendant's willingness or failure to admit wrongdoing, the isolated or repeated nature of the violations, the degree of scienter involved, the defendant's cooperation or lack thereof with authorities, and the defendant's current financial condition." *Esposito*, 260 F. Supp. 3d at 93.

A civil penalty may not exceed the larger of (1) a defendant's gross pecuniary gain or (2) the maximum fixed by the regulation. *See* 15 U.S.C. §§ 77t(d)(2); 78u(d)(3)(B); *S.E.C. v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013). According to the SEC, "for violations that occurred during the relevant period, the regulatory cap is $189,427 per violation by an individual and $947,130 per violation by a corporation." (Mem. in Supp. at 15, citing 17 C.F.R. § 201.1001).

The SEC does not request a specific civil penalty amount, either against Muraca or either of the companies. Instead, it simply states that the Court should order an "appropriate" penalty. (Mem. in Supp. at 15). NMDX contends that a penalty is not warranted, among other reasons, because it has restructured its company, it has "ensured that there will not be a recurrence of [] Muraca's alleged misuse of funds." (Opp. at 20). In addition, it contends that it continues to have no revenue and that it has already been harmed by Muraca's acts. (*Id.*).

Under the circumstances, it is difficult to see how the imposition of a civil penalty against either company is warranted. Muraca is no longer involved with the companies, and the investors who were defrauded have either been made whole or elected to reaffirm their investment amounts. As with disgorgement, a civil penalty would serve no real purpose but to impose a further burden on investors already victimized by Muraca.[6]

---

[6] As a consequence, the Court is imposing no remedy against NDMX or Metabo, despite a finding of liability against both companies. It does not appear that any particular form of remedy, or indeed any remedy, is

As to Muraca, it appears that a penalty would ordinarily be appropriate, but the SEC has provided no guidance as to what the amount ought to be. It is unclear whether that is because the imposition of a penalty would be largely symbolic, because Muraca is unlikely to pay it; because such a penalty might adversely impact the ability of victims to seek restitution; because the civil penalty is largely unnecessary in light of the criminal sanctions imposed; or for some other reason. In any event, if there is a reason to apply a civil penalty on top of the criminal penalties, the SEC has not supplied it. For that reason, the Court will not impose a civil penalty against Muraca.

## IV.  Conclusion

For the foregoing reasons,

1.  The motion of plaintiff Securities and Exchange Commission for summary judgment is GRANTED as to liability, and GRANTED in part as to remedy.

2.  Defendant Patrick J. Muraca is hereby permanently enjoined from engaging in any act or practice in violation of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 340.10b-5, or aiding, abetting, counseling, commanding, inducing, or procuring any such act or practice.

3.  Defendant Patrick J. Muraca is hereby ordered to pay disgorgement in the amount of $411,684, plus prejudgment interest in the amount of $31,442, plus post-judgment interest as provided by statute.

---

mandatory under the relevant statutes.

4. To the extent plaintiff Securities and Exchange Commission seeks additional injunctive relief, disgorgement, or penalties, the motion is DENIED.

5. The motion of defendants NanoMolecularDX, LLC and MetaboRX, LLC, for summary judgment is DENIED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  December 5, 2019                    United States District Judge